IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

MARVIN PIBURN, M.D.,

Plaintiff,

vs.

BLACK HAWK-GRUNDY MENTAL
HEALTH CENTER, INC. AND
THOMAS EACHUS,

Defendants.

No. C15-2045

RULING ON MOTION FOR
SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.   The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      B.   Piburn's Pre-Medical Leave Health and Work Difficulties . . . . . . . . 4
      C.   Piburn's Medical Leave  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      D.   Piburn's Return from Medical Leave . . . . . . . . . . . . . . . . . . . . . 7

IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT  . . . . . . . . . . . . . 12

V.    DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      A.   ADA and ICRA Claims for Failure to Accommodate and
           Failure to Engage in Interactive Process  . . . . . . . . . . . . . . . . . 14
           1.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           2.   Analysis  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                a.   The Parties' Arguments . . . . . . . . . . . . . . . . . . . . 17
                     (1)   Defendants' Arguments  . . . . . . . . . . . . . . . 17
                     (2)   Piburn's Arguments . . . . . . . . . . . . . . . . . . 19

               **b.**     *Application of the Law* . . . . . . . . . . . . . . . . . . . . . 21

                      **(1)**   *Failure to Accommodate Claim* . . . . . . . . . . . 21

                      **(2)**   *Interactive Process Claim* . . . . . . . . . . . . . . 27

   **B.**    **Retaliation Claim Under the ADA and ICRA** . . . . . . . . . . . . . . 32

       **1.**    *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

       **2.**    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

   **C.**    **FMLA Violations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

       **1.**    *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

               **a.**     *Overview of FMLA* . . . . . . . . . . . . . . . . . . . . . . . 37

               **b.**     *Entitlement Claims for Failure to Reinstate* . . . . . . . 38

               **c.**     *Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

       **2.**    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

               **a.**     *Failure to Reinstate Claim* . . . . . . . . . . . . . . . . . 39

               **b.**     *Retaliation Claim* . . . . . . . . . . . . . . . . . . . . . . . 40

**VI.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**VII.**  **ORDER** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## I. INTRODUCTION

This matter comes before the Court on the Second Motion for Summary Judgment (docket number 24) filed by Defendants on January 29, 2016, and the Resistance (docket number 28) filed by Plaintiff on February 22, 2016. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## II. PROCEDURAL HISTORY

On October 19, 2015, Plaintiff Marvin Piburn, M.D., filed an Amended Complaint in federal court.[1] In the Amended Complaint, Piburn alleges violations of the Family Medical Leave Act ("FMLA"), violations of the Americans with Disabilities Act

---

[1] Initially, on August 28, 2014, Piburn filed a Petition at Law and Demand for Jury Trial in the Iowa District Court for Black Hawk County (Case No. LACV125664). Defendants filed a Notice of Removal (docket number 2) on June 9, 2015, transferring the case from the Iowa District Court to the United States District Court for the Northern District of Iowa.

("ADA"), and violations of the Iowa Civil Rights Act ("ICRA"). On November 12, 2015, Defendants Black Hawk-Grundy Mental Health Center, Inc. ("BHGMHC") and Thomas Eachus filed an Answer and Affirmative Defenses, generally denying the material allegations contained in the petition, and asserting certain affirmative defenses. On September 9, 2015, both parties consented to proceed before a United States Magistrate Judge, pursuant to the provisions set forth in 28 U.S.C. § 636(c). Trial is scheduled before the undersigned on September 12, 2016.

Defendants timely filed the instant motion for summary judgment on January 29, 2016.

## III. RELEVANT FACTS

### A. The Parties

Plaintiff Marvin Piburn, M.D., is a board certified psychiatrist who was employed at BHGMHC from October 1984 through May 13, 2014. Piburn was a full-time employee at all times, except for the period of September 1994 through January 1997, when he worked as a part-time contract psychiatrist for BHGMHC. Additionally, at different times during his employment, Piburn served as the Medical Director for BHGMHC, including the final 13 years of his employment.

The Medical Director position requires supervisory responsibilities over all other psychiatrists and all clinical staff. The Medical Director reports to the Executive Director. The Medical Director's essential functions include: (1) evaluation of all clients referred for consideration of medication and prescribed medication as clinically appropriate; (2) follow-up with clients placed on medications; (3) completing all paperwork according to BHGMHC standards; (4) assisting nursing staff with resolution of related issues; (5) providing consultation to clinic staff; (6) developing and promoting good working relationships with other community representatives, agencies, and organizations; (7) complying with all managed care and insurance company requirements; (8) providing

primary coverage for emergency, after-hours calls, and weekends; (9) adherence to BHGMHC's code of ethics; (10) attending and participating in scheduled meetings; and (11) providing clinical oversight to all staff and clinical services.[2] According to the Medical Director "Job Description," the physical demands of the job require "light physical exertion and moving about including bending, crouching, stooping, standing, stretching and reaching or similar activities. Usage of telephone and dictaphone is required as is writing in records."[3] The mental demands of the job include "[f]requent mental and visual attention . . . in performing job duties. Work is repetitive requiring alertness and concentration. . . . Mental demands involve handling multiple tasks."[4]

The record does not contain a job description for the staff psychiatrist position at BHGMHC.

Defendant BHGMHC is a community mental health center located in Waterloo, Iowa. BHGMHC provides comprehensive mental health services for children, adolescents, adults, older adults, couples, and families.

Defendant Thomas Eachus is a trained social worker. He has been employed by BHGMHC since 1988. Beginning in 1993, Eachus became the Executive Director for BHGMHC.

### B. Piburn's Pre-Medical Leave Health and Work Difficulties

Since 2010, Piburn has suffered from sleep apnea, which disrupts his sleep at night, and causes him to experience fatigue during the day. Gradually over time, Piburn became slower in completion of patient visits, causing him to go over the time allotted for an individual patient visit, and into the next patient's allotted time. The delays sometimes

---

[2] See Defendants' Appendix (docket number 26) at 6.

[3] Id.

[4] Id.

created situations where patients waiting to see Piburn would lash out at the front desk staff or leave without having their appointment. In 2013, due to patient delay issues, Piburn's schedule was reduced to two-patient blocks (30 minutes per patient) with 30 minutes of case management between blocks.

On March 25, 2014, a patient became irate and verbally abusive towards the front desk staff due to having to wait 35 minutes for his appointment with Piburn. In response to this incident, Sue Anderson, BHGMHC's Office Manager, sent Piburn an email outlining her concerns. Specifically, Anderson's email provided in pertinent part:

> . . . I am so tried [(*sic*)] of the front desk staff having to deal with upset clients, everyday, all day because you run so late. You have to remember that these clients have to make arrangements with different staff from various agencies for rides and are on a schedule. Or they have friends and family that bring them or sometimes they even have jobs and can't afford to sit here for hours at a time. . . .
>
> Part of the reason I have lost good front desk help is because they got tired of dealing with clients yelling at them because of you. That's about as plain as I can make it. It is unfair that they are put in this position all the time.
>
> I don't know what you have to do, but you need to figure something out to stay on time. . . .

Defendants' Appendix (docket number 26) at 51. Following the March 25 incident, Piburn requested medical leave.

### C. Piburn's Medical Leave

On March 25, 2014, Piburn requested medical leave under the FMLA, and it was approved. He was on medical leave from March 28, 2014 through May 1, 2014. During that time period, Piburn voluntarily entered a 10-day inpatient treatment program at the Mayo Clinic in Rochester, Minnesota, for major depressive episode. According to

5

Piburn's medical leave certification, he was diagnosed with bipolar disorder, depression, obsessive compulsive disorder, obstructive sleep apnea, parkinsonism, and neuropathy. Piburn's treating physician, Dr. Mark Frye, released him to return to work on May 1, 2014 with a reduced schedule "per patients [(sic)] instructions."[5] While under Dr. Frye's care, Piburn and Dr. Frye worked out a schedule that they believed would allow Piburn to continue his work as a treating psychiatrist and BHGMHC's Medical Director. Specifically, Dr. Frye recommended that Piburn see one patient every hour beginning at 8:00 a.m., with his final patient being at 5:00 p.m. Between patients, Piburn could perform his other duties as both a psychiatrist and BHGMHC's Medical Director. Dr. Frye and Piburn believed the proposed schedule would address Piburn's issues with slowness caused by his medical conditions.

While at the Mayo Clinic, Piburn was also treated by Dr. Erik K. St. Louis, M.D., for his sleep disorder. Dr. St. Louis diagnosed Piburn with hypersomnia, most likely narcolepsy without cataplexy. Dr. St. Louis indicated that Piburn was under "appropriate management for these conditions."[6] Dr. St. Louis also agreed with the reduced schedule proposed by Dr. Frye. Specifically, Dr. St. Louis stated:

> from a sleep medicine perspective, Dr. Frye's perspective that a[n] appropriate accommodation for [Piburn's] psychomotor slowing and daytime sleepiness would be to advocate for a modified schedule. Specifically, seeing ten patients spread out over a ten-hour daily period, with a scheduled visit for one half-hour and an intervening half-hour, would be recommended and supported from a medical perspective.

Piburn's Appendix (docket number 29) at 21.

---

[5] Defendants' Appendix (docket number 26) at 55.

[6] Piburn's Appendix (docket number 29) at 21.

## D. *Piburn's Return from Medical Leave*

On April 24, 2014, Piburn presented BHGMHC's Human Resources Director, Donna Herbrandson, with a form entitled "Return from Medical Leave of Absence" signed by Dr. Frye. The form stated Piburn was prepared to return to work on May 1, 2014, with the restriction of a "reduced schedule per patient's instructions." Piburn requested a meeting with Herbrandson, Thomas Eachus, and Sue Anderson. The meeting occurred on April 25, 2014. At the meeting, Piburn presented the schedule recommended by Dr. Frye and supported by Dr. St. Louis. Under the new schedule, Piburn would reduce his patient load from an average of 13 patients per day, to 10 patients per day. Due to the reduction in patient load, Piburn believed it was reasonable to reduce his compensation by 25%. According to Piburn, Eachus immediately stated without explanation that such a schedule would be unacceptable.[7] Furthermore, according to Piburn, Eachus told him that his only opportunity for returning to work on May 1, 2014, would be as a part-time, hourly paid contract psychiatrist.[8]

Believing he had either been demoted to a part-time contract psychiatrist position, or fired, Piburn went to his office on Sunday, April 27, 2014, to clean it out because

---

[7] *See* Piburn's Statement of Additional Material Facts (docket number 28-2) at 5; ¶ 22. Defendants failed to timely respond to Piburn's Statement of Additional Facts, and Defendants' Motion for Extension of Time to File Reply Brief (docket number 30) was denied for failure to show good cause or that Defendants' failure to act resulted from excusable neglect. *See* docket number 31. According to Defendants' statement of undisputed facts, Eachus told Piburn he would take the recommended schedule under advisement, and suggested Piburn consider becoming a part-time employee (contract psychiatrist), with an hourly rate of pay, and no health benefits. *See* Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 7; ¶ 31.

[8] *See* Piburn's Statement of Additional Material Facts (docket number 28-2) at 5; ¶ 22.

"[h]ourly employees share offices. They don't get an office."[9] While cleaning out his office, Piburn encountered Eachus. Piburn told Eachus he intended to file a grievance against Eachus for his failure to accept his request for a reasonable accommodation. Piburn also told Eachus that he was going to contact an attorney to learn about his rights as an employee.[10] According to Piburn, Eachus responded "maybe [you] should not come in to work on May 1 after all[.]"[11] Eachus reasoned that he did not want to have someone working at BHGMHC who was suing it.[12] Piburn believed that Eachus terminated him by telling him not to come to work on May 1.

Following his interaction with Eachus, Piburn left a handwritten note for Eachus to find the following day, April 28, 2014, detailing his complaints regarding his April 25 and April 27 encounters with Eachus.[13] Piburn also taped over the title on his office door, with a handwritten note stating "name and former title are obliterated. Take it back."[14] On April 28, Piburn had his son type the handwritten letter, and left the letter for Eachus to find on April 29. In the letter, Piburn states:

---

[9] Defendants' Appendix (docket number 26) at 30; Piburn's Deposition at 92:17-18.

[10] *See* Piburn's Statement of Additional Material Facts (docket number 28-2) at 7; ¶ 26. *Compare* Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 8; ¶ 35 ("Plaintiff states that he informed Mr. Eachus on April 27, 2014 that he would be filing a grievance against him and contacting a lawyer.").

[11] Piburn's Statement of Additional Material Facts (docket number 28-2) at 7; ¶ 27; *see also* Piburn's Appendix (docket number 29) at 7; ¶ 27 (Piburn's Affidavit).

[12] *Id.*

[13] *See* Defendants' Appendix (docket number 26) at 56-65.

[14] Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 7; ¶ 34.

8

And you continue to abuse me with your refusal to honor my medical release. You abuse me with your demand to return to the same hours that broke me down or become a non-salaried medical contractor. This is your response to someone who has dedicated nearly 3 decades of their life to BHGMHC. . . .

What was your response today when we talked, when I came in to clean out my office, the one I would not be entitled to as a part-time medical contractor? You know what it was. You said that if I went to an attorney to find out my legal rights, "maybe you'd better not come back on May 1st." After all, you said, you couldn't take back an employee that was suing you. Have I filed a suit against you? No! I said I was going to an attorney to learn my legal rights as an employee. I had not selected an attorney or talked to one, or been advised by one. Certainly I had not served you with a notice of a lawsuit. Yet, "Don't come back May 1st," was your response.

I have decided I will file a grievance against you with the board of directors. I asked for [a] form to do this but you did not give me one. . . .

Piburn's Appendix (docket number 29) at 25-26.

Piburn did not return to work on May 1, 2014. On that date, Piburn's attorney sent a letter to Eachus requesting that BHGMHC honor the requested accommodation of a reduced patient schedule, as outlined by Dr. Frye and Piburn. Piburn's attorney also requested BHGMHC's Board of Directors be involved in the discussion of Piburn's requested accommodation due to the grievence Piburn intended to file against Eachus. On May 2, Defendants responded through counsel, requesting a meeting between the lawyers to discuss a reasonable accommodation for Piburn's disability.[15] Correspondence

---

[15] *See* Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 8; ¶ 39; *see also* Defendants' Appendix (docket number 26) at 67-70 (letter from BHGMHC's attorney).

continued between the parties' attorneys. On May 7, 2014, Defendants' attorney wrote Piburn's attorney a letter indicating that Piburn's proposed patient scheduling accommodation was not "feasible, economically or otherwise[.]"[16]

On May 12, 2014, Piburn, his attorney, and BHGMHC's attorney had a meeting to discuss Piburn returning to work at BHGMHC. The discussion did not involve a written offer from BHGMHC, and did not contain specifics with regard to Piburn's position, work hours, compensation, or benefits if he returned to BHGMHC.[17] According to an email from Piburn's counsel, BHGMHC's attorney verbally suggested Piburn could return to work at BHGMHC, but only with reduced compensation, loss of his title as Medical Director, and an elimination of some benefits.[18] At the end of the meeting, Piburn requested a written proposal from BHGMHC regarding his job description, position, wages, and benefits, if he returned to work. Piburn's attorney also informed BHGMHC's counsel that Piburn intended to attend the May 14, 2014 BHGMHC Board of Directors meeting to discuss his status as BHGMHC's Medical Director, and his concerns about being refused a reasonable accommodation for his disability.

On May 13, 2014, the attorneys for both parties engaged in a series of emails, with BHGMHC's attorney urging Piburn not to attend the May 14 Board of Directors meeting,

---

[16] Defendants' Appendix (docket number 26) at 78; *see also* Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 8; ¶ 41. In his Response to Defendants' Second Statement of Undisputed Material Facts, Piburn states that "Paragraph 41 is denied," objecting on the basis of Federal Rule of Civil Procedure 56(c)(2). *See* docket number 28-3 at 3. Piburn offers no rationale or reason for his belief that Rule 56(c)(2) is applicable, but apparently believes the written correspondence from BHGMHC's attorney is inadmissible evidence.

[17] *See* Piburn's Statement of Additional Material Facts (docket number 28-2) at 8; ¶ 32.

[18] *See* Defendants' Appendix (docket number 26) at 85.

as his grievance had not yet been properly submitted under BHGMHC procedure and he would not be on the agenda.[19]  Piburn's attorney responded that Piburn, as Medical Director was entitled to attend the meeting, and would attend the meeting, at a minimum, to discuss his position as Medical Director.[20]

Also on May 13, at 7:00 a.m. a meeting was held with the Executive Committee of the BHGMHC Board of Directors.  At the committee meeting, Eachus addressed the situation involving Piburn, and indicated that the two sides were in negotiations to find an acceptable accommodation for Piburn to keep his employment at BHGMHC.  The Executive Committee minutes provide "[t]he Executive Committee recommended to work with legal counsel for a resolution to the issues and problems presented."[21]  At his deposition, Eachus was questioned about the Executive Committee meeting:

> Q:  And did you ask [the committee] for their opinion or recommendation or permission to end the employment of Dr. Piburn?
> A:  No.
> Q:  At that meeting was it decided by the committee, the Executive Committee, that you should proceed to end the employment of Dr. Piburn?
> A:  No.
> Q:  The last sentence in that paragraph says, the committee recommended to work with legal counsel.  And so in the view of the committee, was it decided that you should just proceed to try to work things out, is that basically what was recommended?
> A:  Yes. . . .

---

[19] *See* Piburn's Piburn's Appendix (docket number 29) at 31-40 (attorney email chain).

[20] *See* Piburn's Piburn's Appendix (docket number 29) at 31-40.

[21] *Id.* at 76.

> Q: At that meeting did you tell the committee that you were intending to bring an end to Dr. Piburn's employment later that day?
>
> A: No.

Piburn's Appendix (docket number 29) at 56; Eachus' Deposition at 26:15-27:7.

Later in the day, on May 13, shortly after 5:00 p.m., Eachus provided Piburn's attorney with a letter terminating Piburn. The letter states that BHGMHC attempted in good faith to find an appropriate accommodation for Piburn, but Piburn rejected BHGMHC's proposal that was verbally discussed by BHGMHC's attorney at the May 12 meeting. The letter concludes:

> We have talked about this issue at considerable length, and, for the good of our patients, the Center, and you, Dr. Piburn, we need to bring closure to this matter. You cleaned out your office on April 27, and you taped over the name and job title on your door. You have not worked collaboratively and in good faith to work toward a reasonable accommodation since that time. You have separated yourself from employment with BHGMHC, and BHGMHC accepts that separation. Your employment with BHGMHC is, unfortunately, at an end.

Defendants' Appendix (docket number 26) at 88.

Other facts that are significant for making a determination on Defendants' motion for summary judgment will be discussed, as necessary, in the Court's consideration of the legal issues presented.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v.*

*Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V. DISCUSSION

In his Amended Complaint, Piburn alleges Defendants violated his rights under the FMLA by failing to restore him to his position as Medical Director and staff psychiatrist at BHGMHC after taking approved medical leave, and by retaliating against him for exercising his rights under the FMLA (Count I), discriminated against him for failure to accommodate his disability, reasonably engage in the interactive process, and retaliation in violation of the ADA (Count II), and discriminated against him for failure to accommodate his disability, reasonably engage in the interactive process, and retaliation in violation of the ICRA (Count III).

## A. ADA and ICRA Claims for Failure to Accommodate and Failure to Engage in Interactive Process

### 1. Applicable Law

Piburn alleges disability discrimination for failure to accommodate under both the ADA and ICRA. When the parties in disability discrimination litigation "do not dispute the application of federal analysis, disability claims under the ICRA are generally analyzed in accord with the ADA." *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007) (citing *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005)); *see also Kallail v. Alliant Energy Corporate Services, Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) ("[D]isability claims under the ICRA are generally analyzed in accord with the ADA"). Therefore, the Court will analyze both Piburn's ADA and ICRA disability discrimination claims using federal law.

Under the general framework of the ADA, employers are prohibited from discriminating against "a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009).[22] *See also Gretillat*, 481 F.3d at 652. The ADA further prohibits employers from:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. . . .

---

[22] The ADA was amended by Congress through the enactment of the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009. *See* Pub. L. No. 110-325, § 8, 122 Stat. 3553. The purpose of the amendment was to clarify what qualified as a disability. *Minnihan v. Mediacom Communications Corp.*, 779 F.3d 803, 810 n.3 (8th Cir. 2015). For purposes of Piburn's claims, the analysis remains the same under the ADA or ADAAA. *Id.*

42 U.S.C. § 12112(b)(5)(A). *See also Peyton v. Fred's Stores of Arkansas, Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). "As the statutory language indicates, ADA protection extends only to a qualified individual with a disability, namely, 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)).[23]

In a failure to accommodate case, "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty--the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). The Eighth Circuit Court of Appeals explained:

> it is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.

*Id.* (citations omitted). Thus, under the ADA, "an employer is required to provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee with a disability, unless the requisite accommodation would impose an

---

[23] Under the post-amendment ADA, a "qualified individual" is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013) ("Congress's 2008 amendments to the ADA did not fundamentally change the qualification requirement although they excised the term "with a disability" from the subsection defining a "qualified individual. . . ." To qualify under the post-amendment ADA, an individual must still be able to "perform the essential functions of the employment position" "with or without reasonable accommodation." 42 U.S.C. § 12111(8).").

undue hardship on the employer's business." *Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 862 (8th Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)).

In reasonable accommodation cases, courts apply a modified burden-shifting analysis. *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707, 712 (8th Cir. 2003). Under the modified burden-shifting approach:

> [T]he employee "must first make a facial showing that he has an ADA disability and that he has suffered an adverse employment action. Then he must make a facial showing that he is a 'qualified individual.'" "To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" In cases where the employee claims that he is able to perform the essential functions of the job with reasonable accommodation, the employee "must only make a 'facial showing that a reasonable accommodation is possible.'" When the employee has made that facial showing "the burden then shifts to the employer to show that it is unable to accommodate the employee."

*Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (quotations and citations omitted). "'If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, then the employee must rebut that showing with evidence of his individual capabilities.'" *Fenney*, 327 F.3d at 712 (quotation omitted). "'At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination.'" *Id.*

Furthermore, "[w]here the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations." *Battle*, 438 F.3d at 862 (citing *Fjellestad v. Pizza Hut of America, Inc.*,

188 F.3d 944, 951 (8th Cir. 1999)). At the summary judgment stage, the Eighth Circuit has stated "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000). In order to show that an employer failed to participate in the interactive process, the plaintiff must show:

> 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 971 (8th Cir. 2014) (quoting *Peyton*, 561 F.3d at 902). If a court concludes that the employer failed to engage in the interactive process, then "a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." *Cravens*, 214 F.3d at 1021 (quoting *Fjellestad*, 188 F.3d at 952). However, "if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process." *Battle*, 438 F.3d at 864 (citation omitted).

## 2. *Analysis*

### a. *The Parties' Arguments*

#### (1) *Defendants' Arguments*

In their brief, Defendants assert they are entitled to summary judgment because:

> the undisputed evidence reveals that BHGMHC is unable to accommodate [Piburn] because, despite BHGMHC's and Mr. Eachus's best efforts, [Piburn] caused the breakdown of the interactive process by failing to propose reasonable accommodations and refusing to even consider the reasonable options BHGMHC and Mr. Eachus provided. Further,

> Defendants are entitled to summary judgment because [Piburn]
> "failed to make a facial showing that reasonable
> accommodation was possible. . . ." [Piburn's] demanded
> accommodations were unreasonable because they would have
> required BHGMHC to go beyond what the ADA mandates by
> displacing some of the essential functions of his position to
> other employees and providing [Piburn] compensation to
> which he was not entitled.

Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 8.

Specifically, Defendants argue Piburn's demanded accommodation--a reduced patient schedule--would cause Piburn to be unable to perform his duties as a staff psychiatrist and Medical Director, place the burden of performing such duties on other BHGMHC practitioners, all while overcompensating Piburn. Defendants maintain Piburn's requested schedule would have him meet with only five patients per day, resulting in decreased billing and meeting with less patients than expected for a full-time salaried employee and the Medical Director. Defendants assert "[w]hile [Piburn] claims that he was able to perform the functions of Medical Director without accommodation, . . . his claim ignores the limitations his requested accommodation placed on total patient time, which would likewise limit the time available to see referred patients, an essential function of the Medical Director position."[24]

Defendants further argue that Piburn's need of a transcriptionist to complete his recordkeeping requirements is also an unreasonable accommodation. Prior to his medical leave, Piburn handwrote his patient notes, and BHGMHC allowed a staff transcriptionist to input his patient notes into electronic records due to his difficulties with typing on a computer and neuropathy in his upper extremities. According to Defendants, Piburn's use

---

[24] Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 13.

of a transcriptionist was an unreasonable accommodation that it was not required to continue upon his return to work. Defendants also implicitly argue that reallocating Piburn's case documentation to a transcriptionist burdens the BHGMHC staff. Lastly, Defendants assert "BHGMHC is not required to tolerate a drop in productivity as it has in the past by attempting to accommodate to minimize [Piburn's] delays" through his use of a transcriptionist.[25] Defendants conclude BHGMHC is not required to provide Piburn a transcriptionist, and such a request is an unreasonable accommodation.

Finally, with regard to Piburn's interactive process claim, Defendants contend Piburn:

> was offered a reduced schedule, with corresponding adjustment in benefits and compensation. [Piburn] rejected that accommodation, insisting on an unreasonable accommodation that falls outside of the demands of the ADA. . . . The interactive process broke down due to [Piburn's] refusal to compromise and participate in good faith in the required interactive process.

Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 16.

### (2)    Piburn's Arguments

In his brief, Piburn argues:

> In the present case, it is undisputed that Dr. Piburn has a disability, that he requested an accommodation for that disability, and that the Defendants refused to adopt the requested accommodation. At a minimum, the records present genuine issues of material fact regarding the fact that Dr. Piburn remained a "qualified individual" with respect to his positions as staff psychiatrist and medical director, and that the accommodations requested were reasonable. Finally, the

---

[25] Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 15.

> evidence shows that the Defendants never intended to
> accommodate Dr. Piburn's disability, and did not make a good
> faith effort to do so or to engage in an interactive process to
> determine an appropriate accommodation. . . . Upon these
> facts, summary judgment would be inappropriate.

Piburn's Brief in Resistance to the Defendants' Second Motion for Summary Judgment
(docket number 28-1) at 5.

Specifically, Piburn argues Defendants immediately refused his requested
accommodation for a reduced patient work schedule. Piburn maintains Defendants failed
to provide any type of explanation for refusing his requested accommodation. Piburn
asserts "Eachus never performed any analysis or did any research or calculations which
would have allowed him to draw a reasonable conclusion that Dr. Piburn's proposed
schedule was unreasonable, or that his proposed schedule would cause any undue hardship
for the Medical Health Center."[26]  In particular, Piburn maintains he is capable of
fulfilling the essential functions of his job, and by minimally reducing his patient schedule,
he "simply sought to eliminate the scheduling of back to back patients, in order to reduce
any patient dissatisfaction or staff discontent from Dr. Piburn running late."[27]  With
regard to the issue of using a transcriptionist, Piburn points out that he started using a
transcriptionist to enter his patient notes in 2012, and the transcriptionist was already a
member of the BHGMHC staff when she started transcribing for him in 2012. Addressing
Defendants' concerns that he would fail to meet productivity standards under his requested
accommodation, Piburn asserts "there are no physician productivity standards at
[BHGMHC]," and he voluntarily offered to reduce his salary by 25% since he would be

---

[26] Piburn's Brief in Resistance to the Defendants' Second Motion for Summary
Judgment (docket number 28-1) at 7.

[27] *Id*. at 8-9.

seeing 2-4 fewer patients each day.[28] Lastly, Piburn argues Defendants "completely failed to initiate an informal interactive process."[29]

### b. Application of the Law

#### (1) Failure to Accommodate Claim

Applying the modified burden-shifting approach for failure to accommodate claims, both parties agree Piburn meets the following facial showing requirements. First, the parties agree Piburn has an ADA disability, complex sleep disorder.[30] Second, the parties agree for purposes of Defendants' summary judgment motion that Piburn also suffered an adverse employment action, he was terminated from employment on May 13, 2014.[31] Third, both parties agree Piburn is a "qualified individual" under the ADA.[32]

---

[28] Piburn's Brief in Resistance to the Defendants' Second Motion for Summary Judgment (docket number 28-1) at 9.

[29] *Id.* at 10.

[30] Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 8 ("BHGMHC and Mr. Eachus do not dispute [Piburn] has a disability[.]").

[31] Defendants describe Piburn's termination as Eachus and BHGMHC recognizing on May 13, 2014, Piburn's "separation" or resignation on April 27, 2014. *See* Defendants'Second Statement of Undisputed Material Facts (docket number 24-1) at 9; ¶ 44. Piburn denies that he resigned or desired separation from BHGMHC. *See* Piburn's Response to Defendants' Second Statement of Undisputed Material Facts (docket number 28-3) at 3; ¶ 44; *See also* Defendants' Appendix (docket number 26) at 8; ¶ 34 (In his affidavit, Piburn states "[w]ithin hours of when I advised them, through counsel on May 13, that I planned to attend the board meeting, I was terminated by a letter emailed to my attorney after business hours. The letter was from Thomas Eachus. In the letter, Mr. Eachus stated that I had 'separated myself' from the Mental Health Center. I did nothing to separate myself from the Mental Health Center. I wanted to return to work.").

[32] Defendants' Brief in Support of Defendants' Second Motion for Summary
(continued...)

Following his medical leave in March and April 2014, Piburn requested a reduced patient schedule as an accommodation for his disability (complex sleep disorder). Under the revised patient schedule, Piburn explained that he:

> would be seeing 10 patients per day and would be spending approximately 5 hours with those patients, perhaps more. The 5 hours of patient time was an estimate and was assuming 30 minutes per patient. Some patients take 45 minutes. I still would be doing my case management and performing my Medical Director duties. I considered it reasonable to reduce my compensation by 25% if the number of patients I saw was reduced from 13 per day (average) to 10 per day. I also thought it was reasonable to reduce my compensation by 25% because I had approximately 8 hours of "paid patient hours and case management time" before my medical leave, and I was going to carry out approximately 6 hours of "paid patient hours and case management time" following my medical leave with the accommodation taken into account. I would still be working 50 hours per week or more at the clinic, but the number of patients being seen would be reduced in order to prevent any slowness or lateness caused by my medical condition from upsetting patients and staff.

Piburn's Appendix (docket number 29) at 6; ¶ 24 (Piburn's Affidavit). Essentially, Piburn requested an accommodation of seeing three less patients per day with a 25% reduction in his compensation for seeing less patients.

Taking these facts into consideration, the Court believes Piburn has: (1) made a facial showing that he has an ADA disability and suffered an adverse employment action; (2) made a facial showing that he is a "qualified individual" under the ADA; and (3) made a facial showing that a reasonable accommodation is possible. *See Brannon*, 521 F.3d

---

[32](...continued)
Judgment (docket number 25-1) at 8 ("BHGMHC and Mr. Eachus do not dispute [Piburn] . . . is a qualified individual.").

at 848 (providing the facial showing requirements for a plaintiff under the modified burden-shifting approach used in a failure to accommodate cases).

The burden now shifts to Defendants to show they are unable to accommodate Piburn. In their brief, Defendants offer three reasons for being unable to meet Piburn's requested accommodation. First, Defendants assert Piburn's reduced patient schedule, seeing only 5 patients per day, would limit Piburn's ability to perform his duties as Medical Director, create additional work, and cause undue burden on other employees at BHGMHC. Second, Defendants maintain Piburn's requested accommodation would require his compensation and benefits to be reduced because he would only be seeing 5 patients per day. To that end, Defendants verbally offered to keep Piburn as a part-time contract psychiatrist with loss of full-time employee benefits and his position as Medical Director. Third, Defendants contend it is an unreasonable accommodation to have to hire a transcriptionist for Piburn's recordkeeping duties.

The burden shifts back to Piburn to rebut Defendants' assertion that they are unable to meet Piburn's requested accommodation.

In considering Piburn's rebuttal to Defendants' assertion that they are unable to meet Piburn's requested accommodation, the Court begins by noting that Defendants' contention that Piburn requested a reduced patient schedule which would allow him to see only 5 patients during the workday is incorrect. It appears that Defendants base their assertion of Piburn requesting to only see 5 patients per day on one sentence in a 10-page handwritten document Piburn provided Eachus, after he believed Eachus fired him on April 27, 2014. In the handwritten document, after stating that the reduced patient schedule he was requesting would allow him to see 10 patients per day, Piburn states

"I have no doubt I'll spend 1 hour with each pt, not 30 minutes."[33] While this statement is in Piburn's handwritten note, it is clear, not only from other portions of the handwritten note, but also from Piburn's treating physicians, Dr. Frye and Dr. St. Louis, that Piburn was requesting a reduced patient schedule from an average of 13 patients per day to 10 patients per day.[34] Furthermore, in his deposition, Eachus admitted that Piburn's request for a reduced patient schedule would have him seeing 10 patients per day.[35] Moreover, according to his deposition testimony, Eachus believed prior to his medical leave, Piburn was seeing "maybe" 10 or 12 patients per day.[36] It is clear to the Court that Piburn's requested accommodation was to have a reduced patient schedule from an average of 13 patients per day to 10 patients per day, not 5 patients per day as Defendants argue in their brief.

Moreover, in his deposition, Eachus stated he made no calculations as to monetary loss or patient loss in determining BHGMHC was unable to accommodate Piburn's request for a reduced patient schedule. Specifically, Eachus' deposition testimony provides:

---

[33] *See* Defendants' Appendix (docket number 26) at 65.

[34] *See* Defendants' Appendix (docket number 26) at 65. (Piburn's handwritten note providing he would see one patient each hour from 8:00 a.m. to 5:00 p.m. for 30 minutes, totaling 10 patients per day); *see also Id.* at 73 (Letter from Dr. Frye limiting Piburn to "five hours of patients per day, each patient separated from the next by 0.5 hour[.]"); Piburn's Appendix (docket number 29) at 21 (Dr. St. Louis' letter outlining that Piburn would see 10 per day under the proposed reduce patient schedule); *Id.* at 6; ¶ 24 (Piburn's Affidavit providing "I would be seeing 10 patients per day and would be spending approximately 5 hours with those patients, perhaps more. The 5 hours of patient time was an estimate and was assuming 30 minutes per patient.").

[35] *See* Piburn's Appendix (docket number 29) at 68; Eachus' Deposition at 123:5-7.

[36] *Id.*; Eachus' Deposition at 123:8-12.

24

Q:      Did you ever sit down after this schedule was put in
        writing by [Piburn] around April 27th or 28th, did you
        ever sit down and do a comparison of the old schedule
        versus the new in terms of the number of patients he
        would be seeing on a daily basis?

A:      I don't believe so.

Q:      After you received these letters around April 28th and
        April 29th of 2014, did you ever sit down and perform
        calculations where you tried to compute the amount of
        income, revenue change or net income change that the
        medical clinic would sustain by virtue of this change in
        schedule that he was proposing?

A:      I may have played with some numbers. I can't tell you
        whether I kept any notes or whether I came to any
        specific conclusions.

Q:      You don't have any recollection of the specifics?

A:      No.

Q:      You don't have any recollection of the conclusions you
        may have come to?

A:      I came to a conclusion that whatever schedule
        Dr. Piburn proposed was not going to work.

Q:      You came to that conclusion?

A:      I did.

Q:      But do you have any calculations that you did that
        would have supported your conclusion in terms of a
        specific calculation of monetary loss or patients lost or
        anything of that nature?

A:      No.

Piburn's Appendix (docket number 29) at 68; Eachus' Deposition at 123:19-124:24.

It appears that the only discussion of economic concerns with Piburn's requested accommodation is presented in a letter dated May 7, 2014, from BHGMHC's counsel to Piburn's counsel.[37] In the letter, BHGMHC's counsel stated Piburn's requested accommodation is not economically feasible. However, the letter's calculations are based

_____

[37] *See* Defendants' Appendix (docket number 26) at 78-81.

on Piburn seeing only 5 patients per day, not 10 patients per day as he requested in his accommodation.

Similarly, it appears that Defendants' contention in their brief that Piburn's requested accommodation would limit his ability to fulfill his Medical Director duties is based on Piburn seeing 5 patients per day, instead of 10 patients per day.[38] Moreover, Defendants do not support their contentions with evidence.[39] *See Reasonover*, 447 F.3d at 578 ("Evidence, not contentions, avoids summary judgment.").

Finally, Defendants' argument with regard to hiring a transcriptionist as an unreasonable accommodation is misplaced. Piburn did not request a transcriptionist as part of his request for accommodation. Piburn began using a transcriptionist in 2012 because he had poor keyboarding skills and neuropathy in his upper extremities. According to Piburn, he requested a transcriptionist and one was given to him. Specifically, Piburn states:

> I informed Thomas Eachus that I needed to utilize a transcriptionist to do the inputting of patient information into the computer for me. Mr. Eachus did not question this or express any concern about this request. He immediately agreed that I could have a transcriptionist who was already employed by the Mental Health Center [to] take my handwritten notes and input the necessary information into the computer. There was no controversy whatsoever regarding my request. It was not discussed as an "accommodation." Mr. Eachus did not ever mention that my occasional use of the transcriptionist to input my patient information into the computer was unreasonable or caused any financial or other hardship to the Mental Health Center.

---

[38] *See* Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 13.

[39] *See id.*

Piburn's Appendix (docket number 29) at 2; ¶ 11 (Piburn's Affidavit). Similarly, in his deposition, Piburn stated that the transcriptionist "was my idea and it was my requrest, and they did not block it."[40]

Based on the foregoing facts, and viewing the record in the light most favorable to Piburn, and affording Piburn all reasonable inferences, the Court finds a genuine dispute exists as to whether Defendants fulfilled their duty under both the ADA and ICRA to reasonably accommodate Piburn. *See Peebles*, 354 F.3d at 767. Accordingly, Defendants' motion for summary judgment on Piburn's reasonable accommodation claim is denied.

### (2)    *Interactive Process Claim*

Turning to the issue of whether Defendants properly participated in the interactive process to find a reasonable accommodation for Piburn, the record demonstrates that there is no dispute Defendants were aware of Piburn's disability. It is also undisputed that Piburn requested an accommodation of a reduced patient schedule for his disability.

Next, in considering whether Defendants made a good faith effort to assist Piburn in seeking an accommodation(s), the Court considers the following facts. First, on April 25, 2014, Piburn presented Defendants with his requested accommodation of a reduced patient schedule. According to Piburn, Eachus immediately stated that such a schedule would be unacceptable.[41] Furthermore, according to Piburn, Eachus told him that his only

---

[40] Defendants' Appendix (docket number 26) at 19; Piburn's Deposition at 44:13-14.

[41] *See* Piburn's Statement of Additional Material Facts (docket number 28-2) at 5; ¶ 22. While not disputing Piburn's contention, Defendants maintain Eachus told Piburn he would take the recommended schedule under advisement, and suggested Piburn consider becoming a part-time employee, with an hourly rate of pay, and no health benefits. *See*

(continued...)

opportunity for returning to work on May 1, 2014, would be as a part-time, hourly paid contract psychiatrist.[42]

Second, on April 27, 2014, believing he had either been demoted to a part-time contract psychiatrist position, or fired, Piburn went to his office to clean it out. While at his office, Piburn encountered Eachus. Piburn told Eachus he intended to file a grievance against Eachus for his failure to accept his request for a reasonable accommodation. Piburn also told Eachus that he was going to contact an attorney to learn about his rights as an employee.[43] According to Piburn, Eachus responded "maybe [you] should not come in to work on May 1 after all[.]"[44] Eachus reasoned that he did not want to have someone working at BHGMHC who was suing it.[45] Piburn believed that Eachus terminated him by telling him not to come to work on May 1.[46]

Third, following his interaction with Eachus, Piburn wrote a long letter to Eachus detailing his complaints with the manner in which Eachus had addressed his request for an

---

[41](…continued)
Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 7; ¶ 31.

[42] *See* Piburn's Statement of Additional Material Facts (docket number 28-2) at 5; ¶ 22.

[43] *Id*. at 7; ¶ 26. *Compare* Defendants' Second Statement of Undisputed Material Facts (docket number 24-1) at 8; ¶ 35 ("Plaintiff states that he informed Mr. Eachus on April 27, 2014 that he would be filing a grievance against him and contacting a lawyer.").

[44] Piburn's Statement of Additional Material Facts (docket number 28-2) at 7; ¶ 27; *see also* Piburn's Appendix (docket number 29) at 7; ¶ 27 (Piburn's Affidavit).

[45] *Id*.

[46] *Id*.

accommodation.  The letter was later typed and provided to Eachus.[47]  In the letter,
Piburn stated:

> What was your response today when we talked[?] . . . You
> know what it was.  You said that if I went to an attorney to
> find out my legal rights, "maybe you'd better not come back
> on May 1st."  After all, you said, you couldn't take back an
> employee that was suing you.  Have I filed a suit against you?
> No!  I said I was going to an attorney to learn my legal rights
> as an employee.  I had not selected an attorney or talked to
> one, or been advised by one.  Certainly I had not served you
> with a notice of a lawsuit.  Yet, "Don't come back May 1st,"
> was your response.

Piburn's Appendix (docket number 29) at 25-26.

Fourth, Piburn did not return to work on May 1, 2014.  Between May 1 and May
11, the attorneys for both parties exchanged letters and emails discussing Piburn's
requested accommodation of a reduced patient schedule.  On May 12, 2014, Piburn, his
attorney, and BHGMHC's attorney had a meeting to further discuss Piburn returning to
work at BHGMHC.  An official written offer from BHGMHC was not presented to
Piburn.  Instead, BHGMHC through its attorney continued to present Eachus' initial April
25, 2014 position that Piburn could return to work as a part-time hourly paid contract
psychiatrist with loss of his title as Medical Director, and an elimination of some
benefits.[48]

Fifth, on May 13, 2014, Eachus called a meeting with the Executive Committee of
the Board of Directors.  Eachus addressed the situation with Piburn, and indicated that the
two sides were in negotiations to find an acceptable accommodation for Piburn to keep him
employed at BHGMHC.  The Executive Committee minutes provide "[t]he Executive

---

[47] *See* Defendants' Appendix (docket number 26) at 56-65.

[48] *Id*. at 85.

Committee recommended to work with legal counsel for a resolution to the issues and problems presented."[49]  At his deposition, Eachus was questioned about the Executive Committee meeting:

> Q:   And did you ask [the committee] for their opinion or recommendation or permission to end the employment of Dr. Piburn?
> A:   No.
> Q:   At that meeting was it decided by the committee, the Executive Committee, that you should proceed to end the employment of Dr. Piburn?
> A:   No.
> Q:   The last sentence in that paragraph says, the committee recommended to work with legal counsel.  And so in the view of the committee, was it decided that you should just proceed to try to work things out, is that basically what was recommended?
> A:   Yes. . . .
> Q:   At that meeting did you tell the committee that you were intending to bring an end to Dr. Piburn's employment later that day?
> A:   No.

Piburn's Appendix (docket number 29) at 56; Eachus' Deposition at 26:15-27:7.

Sixth, later the same day, following the morning Executive Committee meeting, shortly after 5:00 p.m., Eachus provided Piburn's attorney with a letter terminating Piburn.  The letter stated that BHGMHC attempted in good faith to find an appropriate accommodation for Piburn, but Piburn rejected BHGMHC's proposal that was verbally presented by BHGMHC's attorney at the May 12 meeting.  The letter concludes:

> We have talked about this issue at considerable length, and, for the good of our patients, the Center, and you, Dr. Piburn, we need to bring closure to this matter.  You cleaned out your office on April 27, and you taped over the name and job title

---

[49] Defendants' Appendix (docket number 26) at 76.

on your door. You have not worked collaboratively and in good faith to work toward a reasonable accommodation since that time. You have separated yourself from employment with BHGMHC, and BHGMHC accepts that separation. Your employment with BHGMHC is, unfortunately, at an end.

Defendants' Appendix (docket number 26) at 88.

Seventh, prior to the termination letter sent on May 13, 2014, shortly after 5:00 p.m., Piburn had intended to attend the BHGMHC Board of Directors meeting on May 14, to discuss his position as Medical Director and inform the board he intended to file a grievance against Eachus for refusing to reasonably accommodate his disability. Because he was terminated, Piburn did not attend the May 14 Board of Directors meeting. Even though earlier in the day on May 13, as discussed in point 5 above, the Board's Executive Committee recommended BHGMHC "work with legal counsel for a resolution to the issues and problems presented[,]" Eachus decided to terminate Piburn that evening.[50] Specifically, in his deposition, Eachus explained that, after the Executive Committee meeting, "I came to a conclusion that whatever schedule Dr. Piburn proposed was not going to work."[51] Eachus also admitted that terminating Piburn was the only way to prevent Piburn from attending the Board meeting on May 14.[52]

Viewing these facts in the light most favorable to Piburn, there is evidence in the record that: (1) Defendants denied Piburn's requested accommodation at their initial meeting to discuss accommodations for Piburn; (2) Eachus told Piburn not to return to work on May 1, 2014 if he was going to file a grievance and sue BHGMHC; (3) Defendants' initial offer to allow Piburn to work as a part-time contract psychiatrist

---

[50] Defendants' Appendix (docket number 26) at 76.

[51] *Id.* at 68; Eachus' Deposition at 124:16-17.

[52] *Id.* at 71; Eachus' Deposition at 144:4-145:2.

with loss of his Medical Director position and reduced benefits never changed from April 25, 2014 through May 12, 2014; (4) Defendants terminated Piburn on the evening of May 13, 2014, even though on the morning of May 13, the Executive Committee of the BHGMHC Board of Directors recommended BHGMHC continue to work with Piburn to find an accommodation which would allow him to remain employed at BHGMHC; and (5) terminating Piburn on May 13 would prevent Piburn from attending a Board meeting on May 14 to discuss his employment situation and intention to file a grievance against Eachus. The Court believes these facts, when viewed in the light most favorable to Piburn and afforded all reasonable inferences, raise a genuine issue of dispute as to whether Defendants properly participated in the interactive process, and made a good faith effort to assist Piburn in seeking an accommodation. *See Product Fabricators, Inc.*, 763 F.3d at 971 (providing in an interactive process claim that a plaintiff must show his or her employer failed to make a good faith effort to assist the employee in seeking accommodations). Additionally, given that the Court in section *V.A.2.b(1)* of this decision, found a genuine dispute as to whether Defendants fulfilled their duty to find a reasonable accommodation for Piburn, the Court also finds a genuine dispute as to whether Piburn could have been reasonably accommodated but for Defendants' lack of good faith. *Id.* Accordingly, Defendants' motion for summary judgment on Piburn's interactive process claim is denied.

### B. Retaliation Claim Under the ADA and ICRA

#### 1. Applicable Law

The ADA prohibits employers from "discriminating against any individual because that individual 'has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.'" *Product Fabricators, Inc.*, 763 F.3d at 972 (quoting 42 U.S.C. § 12203(a)). Similarly, the ICRA makes it a discriminatory

practice for any person to retaliate against another person "because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter." Iowa Code § 216.11(2).

Without direct evidence of a retaliatory motive, courts analyze retaliation claims (whether under Title VII, the ADA, or the ADEA) under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *Stewart v. Independent School Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). Applying the analytical framework set forth in *McDonnell Douglas*, the initial burden is on the plaintiff to establish a *prima facie* case of retaliation. *Id.* at 1043. In order to establish unlawful retaliation under the ADA, a plaintiff must show that: "(1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013) (citing *Amir v. St. Louis University*, 184 F.3d 1017, 1025 (8th Cir. 1999)). *Accord Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004) (enumerating the elements necessary to establish a *prima facie* case of retaliation under the ICRA).

If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to show a "non-retaliatory reason for the adverse employment action." *Stewart*, 481 F.3d at 1043. If the defendant can show a legitimate, non-retaliatory reason for its actions, then the burden returns to the plaintiff to present evidence that "(1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference that defendant acted in retaliation." *Id.* (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005)).

33

## 2.    *Analysis*

Piburn is able to establish a *prima facie* case of retaliation. First, Piburn informed Defendants that he planned to file a grievance against Eachus for failing to accommodate his disability. Both parties agree that such an act constitutes Piburn engaging in a statutorily protected activity. Second, while Defendants couch their termination of Piburn as acceptance of his resignation, they agree that this constitutes an adverse employment action. Piburn denies that he resigned from BHGMHC and asserts that he was terminated by official letter on May 13, 2014, and by statement of Eachus on April 27, 2014.[53] In any event, it is undisputed by the parties that Piburn suffered an adverse employment action.

Neither party addresses the causal connection between the adverse action and the protected activity, but a causal connection clearly exists for purposes of the *prima facie* case. On April 27, 2014, when Piburn stated he was going to file a grievance against Eachus, Piburn maintains Eachus responded "maybe [you] should not come in to work on May 1 after all[.]"[54] Eachus indicated to Piburn he did not want someone working at BHGMHC who was suing it.[55] Moreover, on May 13, 2014, Eachus began the day at an Executive Committee meeting of the BHGMHC Board of Directors, where the committee recommended BHGMHC "work with legal counsel for a resolution to the issues and

---

[53] *See* Defendants' Appendix (docket number 26) at 87-88 (termination letter). *see also* Piburn's Statement of Additional Material Facts (docket number 28-2) at 7; ¶ 27; Piburn's Appendix (docket number 29) at 7; ¶ 27 (Piburn's Affidavit) (support for Piburn's belief that he was terminated on April 27, 2014).

[54] Piburn's Statement of Additional Material Facts (docket number 28-2) at 7; ¶ 27; *see also* Piburn's Appendix (docket number 29) at 7; ¶ 27 (Piburn's Affidavit).

[55] *Id.*

34

problems presented" regarding Piburn's request for accommodation.[56] By the end of the day on May 13, however, Eachus sent Piburn a letter terminating his employment. Prior to his termination, Piburn had planned to address his grievance against Eachus the next day, on May 14, at the BHGMHC Board of Directors meeting. In his deposition, Eachus acknowledged the only way to prevent Piburn from attending the Board meeting on May 14, was to terminate him.[57] Based on the foregoing, the Court concludes Piburn has successfully established a causal connection between the adverse action and protected activity; and therefore, established his *prima facie* case.

The burden now shifts to Defendants to articulate a non-retaliatory reason for the adverse employment action. In their brief, Defendants assert Piburn "claimed he could not return to work without an accommodation. BHGMHC and [Piburn] engaged in a vigorous interactive process to determine whether a reasonable accommodation was possible, and the interactive process broke down. [Piburn] demanded unreasonable accommodations that BHGMHC did not have a duty to provide. Employment separation was the next step in the process[.]"[58] Contrary to Defendants' assertion, in sections *V.A.2.b(1)-(2)* of this decision, the Court determined there were genuine factual disputes with regard to whether Defendants properly participated in the interactive process and whether Piburn's requested accommodation was reasonable. Thus, Defendants have not met their burden of articulating a non-retaliatory reason for Piburn's termination.

Even assuming Defendants properly articulated a non-retaliatory reason for Piburn's adverse employment action, the Court finds a genuine dispute as to whether Defendants'

---

[56] Defendants' Appendix (docket number 26) at 76.

[57] *Id.* at 71; Eachus' Deposition at 144:4-145:2.

[58] Defendants' Brief in Support of Defendants' Second Motion for Summary Judgment (docket number 25-1) at 18.

reason for terminating Piburn was pretextual and Defendants acted in retaliation. Specifically, on April 27, 2014, after Piburn told Eachus he was going to file a grievance against him for failing to accept his request for a reasonable accommodation, and contact an attorney to learn about his rights as an employee, Eachus responded "maybe [you] should not come in to work on May 1 after all[.]"[59] Eachus reasoned that he did not want to have someone working at BHGMHC who was suing it.[60] Moreover, on May 13, 2014, Eachus began the day at an Executive Committee meeting of the BHGMHC Board of Directors, where the committee recommended BHGMHC "work with legal counsel for a resolution to the issues and problems presented" regarding Piburn's request for accommodation.[61] By the end of the day on May 13, Eachus sent Piburn a letter terminating his employment. Piburn had planned to address his grievance against Eachus the next day, on May 14, at the BHGMHC Board of Directors meeting. In his deposition, Eachus acknowledged the only way he could prevent Piburn from attending the Board meeting on May 14, was to terminate him.[62]

Viewing these facts in the light most favorable to Piburn and affording all reasonable inferences, the Court finds a genuine issue of dispute as to whether Defendants' termination of Piburn was pretext for retaliation. Accordingly, Defendants' motion for summary judgment on Piburn's retaliation claim is denied.

---

[59] Piburn's Statement of Additional Material Facts (docket number 28-2) at 7-8; ¶¶ 26, 27, 35.

[60] *Id*.

[61] Defendants' Appendix (docket number 26) at 76.

[62] *Id*. at 71; Eachus' Deposition at 144:4-145:2.

## C. FMLA Violations

In this case, Piburn alleges: (1) an entitlement claim for failure to reinstate him to his position as Medical Director and staff psychiatrist at BHGMHC after taking approved medical leave under the FMLA; and (2) a retaliation claim for terminating him for exercising his FMLA rights.

### 1. Applicable Law

#### a. Overview of FMLA

"The FMLA entitles an employee to twelve weeks of leave from work during any twelve-month period if the employee meets certain statutory requirements." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (citing 29 U.S.C. § 2612(a)(1)). Prohibited acts are established by two subsections of the statute. "Section 2615(a)(1) makes it unlawful for an employer to 'interfere with, restrain, or deny the exercise of or the attempt to exercise' rights provided under the FMLA." *Pulczinski*, 691 F.3d at 1005. The statute also "makes it unlawful for 'any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful' by the FMLA." *Id.* (citing 29 U.S.C. § 2615(a)(2)).

The Eighth Circuit Court of Appeals has recognized three types of claims arising under Section 2615(a)(1)-(2): (1) entitlement claims, (2) discrimination claims, and (3) retaliation claims. *Johnson v. Wheeling Machine Products*, 779 F.3d 514, 517 (8th Cir. 2015). In an entitlement claim, "an employee alleges a denial of a benefit to which he was entitled under the statute[.]" *Id.* In a discrimination claim, an employee alleges the employer discriminated against him or her because the employee exercised his or her rights under the FMLA. *Id.* Finally, in a retaliation claim, "an employee alleges that the employer took adverse action against him for opposing a practice made unlawful under the FMLA." *Id.* at 517-18; *see also Pulczinski*, 691 F.3d at 1005-1006 (providing a detailed discussion of the three types of claims arising under Section 2615(a)(1)-(2)).

### b.   Entitlement Claims for Failure to Reinstate

"Employees who show they qualify for FMLA leave are entitled to be restored to their positions or the equivalent upon returning to work." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 991 (8th Cir. 2005) (citing 29 U.S.C. § 2614(a)(1)).  An employee, however, "is not entitled to restoration if, at the end of the FMLA period, the employee is still unable to perform an essential function of the job." *Hatchett v. Philander Smith College*, 251 F.3d 670, 677 (8th Cir. 2001) (citations omitted); *see also* 29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA.").  Additionally, in contrast to the ADA, "the FMLA does not impose a duty of reasonable accommodation." *Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 806-07 (8th Cir. 2013).  The FMLA only "requires the employer to reinstate the employee to her original position or to an 'equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment,' 29 U.S.C. § 2614(a)(1)(B), following such period of leave." *Id.* at 807 (citing *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir. 2002)).

In order to succeed on an entitlement claim for failure to reinstate, a plaintiff must establish that he or she was, in fact, entitled to FMLA leave and reinstatement. *Johnson*, 779 F.3d at 518 (citing *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006)).

### c.   Retaliation

"The FMLA prohibits employers from discriminating against employees for asserting rights under the Act." *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) (citing 29 U.S.C. § 2612)); *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir. 2005) ("Retaliation through an adverse employment action based on an employee's exercise of FMLA rights is actionable.").  Absent direct evidence, an FMLA

retaliation claim is analyzed under the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a *prima facie* case. *Id.* In order to establish a *prima facie* case, the plaintiff must "'show that she exercised rights afforded by the Act, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action.'" *Id.* (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)). If a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. *Phillips*, 547 F.3d at 912. If the defendant is successful, the burden shifts back to the plaintiff to "come forward with evidence that creates an issue of fact as to whether the asserted reason was pretext for discrimination." *Id.*

### 2. Analysis

#### a. Failure to Reinstate Claim

In his failure to reinstate claim under the FMLA, it is undisputed Piburn was entitled to FMLA leave, but the Court concludes he was not entitled to reinstatement under the FMLA. Because the FMLA does not impose a duty of reasonable accommodation, and Piburn specifically requested upon his return from FMLA leave an accommodation of a reduced patient schedule with reduced compensation for reduced daily patient hours, Piburn is not entitled to reinstatement under the FMLA. *See Dollar*, 710 F.3d at 807 (The FMLA only "requires the employer to reinstate the employee to her original position or to an 'equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment,' 29 U.S.C. § 2614(a)(1)(B), following such period of leave."). Due to the nature of his requested accommodation--a reduced patient schedule with reduced patient hours and reduced compensation--Piburn is apparently unable to meet the requirements of his original position at BHGMHC prior to taking FMLA leave, or its

39

equivalent, and therefore, is not entitled to reinstatement. *See Hatchett*, 251 F.3d at 677 (An employee "is not entitled to restoration if, at the end of the FMLA period, the employee is still unable to perform an essential function of the job."); *see also* 29 C.F.R. § 825.216(c). Because Piburn is unable to perform the essential functions of his job prior to taking FMLA leave without accommodation, he is not entitled to reinstatement under the FMLA. *See Dollar*, 710 F.3d at 806-07 (Providing "the FMLA does not impose a duty of reasonable accommodation."). Accordingly, the Court concludes Defendants are entitled to summary judgment on Piburn's reinstatement claim under the FMLA.

### b. *Retaliation Claim*

In his retaliation claim under the FMLA, Piburn meets the first two prongs of his *prima facie* case. He exercised his FMLA rights, and was terminated following his FMLA leave. In his brief, Piburn does not address his retaliation claim under the FMLA. Furthermore, at no place in his brief, does he address a causal connection between his exercise of FMLA rights and his termination. Based on the record before it, the Court finds no causal connection between Piburn's exercise of his FMLA rights and his termination. The record demonstrates that upon returning from FMLA leave, Piburn requested an accommodation due to a disability, and the facts surrounding his termination pertain to the inability of Piburn and Defendants to agree upon a reasonable accommodation for his disability. There is no evidence in the record that Defendants' decision to terminate Piburn was motivated by Piburn's exercise of his FMLA rights. Because Piburn has failed to show a causal connection between his exercise of FMLA rights and his termination, he is unable to establish a *prima facie* case of retaliation under the FMLA. *See Phillips*, 547 F.3d at 912 (describing the *prima facie* case for a FMLA retaliation claim). Accordingly, Defendants are entitled to summary judgment on Piburn's FMLA retaliation claim.

## VI. CONCLUSION

The Court concludes Defendants are entitled to summary judgment on Piburn's claims under the FMLA for failure to reinstate and retaliation. The Court further concludes, however, that Defendants are not entitled to summary judgment on Piburn's claims of disability discrimination for failure to accommodate and reasonably engage in the interactive process, and retaliation in violation of the ADA and ICRA.

## VII. ORDER

### IT IS THEREFORE ORDERED AS FOLLOWS:

The Second Motion for Summary Judgment (docket number 24) filed by Defendants Black Hawk-Grundy Mental Health Center, Inc. and Thomas Eachus is hereby **GRANTED in part** and **DENIED in part**. Defendants are entitled to summary judgment on Piburn's claims under the FMLA for failure to reinstate and retaliation. Count I of the Amended Complaint is **DISMISSED**. Defendants are not entitled to summary judgment on Piburn's claims of disability discrimination for failure to accommodate and reasonably engage in the interactive process, and retaliation in violation of the ADA and ICRA. Counts II and III of the Amended Complaint will proceed in their normal course.

DATED this 13th day of April, 2016.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA